The Judges of the United States Court of Appeals for the Fourth Circuit. Oyez, oyez, oyez, all persons having any manner or form of business before the Honorable United States Court of Appeals for the Fourth Circuit are admonished to draw to night and give their attention for the Court is now sitting. God save the United States and this Honorable Court. May we be seated? Thank you. Mr. Goldberg. Thank you, Your Honor. What does a reasonable landlord do when they have space to lease? Well, the first thing he might do or she might do is to put a forensic on the building. Montgomery Park put a banner on the building which cost them $30,000. It was an enormous banner. They might prepare a brochure. They might give a brochure to local brokers. They might invite local brokers to tour the premises. They might give specific tours to see a specific premises. And they might give proposals. And Montgomery Park, as we outlined on pages 11 through 20 of our opening brief, did every one of these things. In fact, within 26 days after NCO vacated the premises, there was a tour of the NCO space. In July, just two months after they vacated the premises, there was another tour of the NCO space to Exelon. In September, there was another tour of the NCO space to University of Maryland. Overall, there were a dozen tours of the NCO space during the damaged period. Can I ask you just a quick question? So the district court found that despite all of that, Montgomery Park did not use reasonable commercial efforts to re-let that space. What's our standard of review on that finding? Standard of review, since it is a legal standard that the court applied, is de novo. And what legal standard do you think the court applied? Pardon? What legal standard do you think the district court applied? The district court basically was very clear in what it applied. The district court said that you essentially ignore everything that was done by Montgomery Park, except as to those things which only or specifically referenced the NCO space. For example, the district court said at 1234 of our extract that they must advertise NCO and promote it specifically and not part of an overall scheme to fill a larger vacant space. The district court said at 1234 of our extract that you must give special care and attention to NCO. The most astonishing part of what the district court said was at 1229, where it said Mr. Haas was hired to act in Montgomery Park's best interest, not NCO's. Well, why would Montgomery Park have to hire a broker to act in NCO's interest? NCO could have hired its own broker. Well, I guess the concern, right, is that you worry that there's a landlord who thinks I should be putting more emphasis on my other space because I can kind of count on a rent flow from this one in the form of damages. So I imagine that was the district court's concern, right? Well, that may have been, but there's two answers to that. First of all, under the law, and there's no law that I know of to the contrary, a landlord does not have to favor the defaulting tenant's space over his own space. There's no case that we found which says that. Secondly, there's no evidence that that ever happened or resulted. The most ironic part of this case is of the 500,000 square feet that was available during the damage period. Only 17,000 of those feet were ever leased. So Montgomery Park was unable to lease its own space. It was unable to lease the NCO space. There's no evidence that, for example, all of the other space was leased, and nobody paid attention to the NCO space. As I've said before, there were at least a dozen different visits to the NCO space. So there's no evidence that as a result of what they did, somehow everything got rented except NCO. That's not what happened. So the fact of the matter is there is no obligation on the part of a landlord to favor the defaulting tenant's space. And what's interesting is that if you look at the Wilson versus Rule case, which we cite in our brief, Wilson versus Rule involved a residential lease. And, of course, there is a Maryland statute which deals with what the Maryland public policy is with regard to this issue. And it deals with only residential leases. But the standard that is set forth in the statute is virtually the same standard as set forth in this lease, which is to use reasonable commercial efforts. Well, the Maryland legislature, when they adopted the statute, basically included a statement saying that the landlord does not have to favor the defaulting tenant's space. Now, if the Maryland legislature is establishing the public policy of Maryland, and in the residential area, which they certainly would have more interest in protecting a defaulting tenant than in a commercial area, you have a national company who's renting hundreds of thousands of square feet, you would think the Maryland legislature, if they are establishing Maryland public policy, would have gone as far as they thought reasonable to go to protect the tenant. But that's not what happened. There's a specific provision saying that the landlord can rent other space in the building and not rent the defaulting tenant's space. So even the public policy of the state of Maryland in the statute that they adopted indicates that the district court standard is not applicable in Maryland. In fact, when you look at the Wilson versus Rule case, what the Maryland Court of Appeals said was all you need do, all a reasonable landlord needs to do, is to hire a broker to lease the space. And that's what most every landlord eventually does. And what was done here, and a broker was hired for three and a half years to try, during the damage period, to try to lease the space. The broker, as was admitted by NCO's expert, was one of the leading brokers in the Baltimore area, frankly one of the leading brokers nationally. The individual, Mr. Haas, who was in charge of the brokerage, Mr. Gaines admitted, was the type of broker with the experience of a broker who a reasonable landlord would hire. And so what we did was what Wilson versus Rule specifically said is all that is necessary. All that is necessary is to hire a broker to lease the space, which is what we did. Mr. Haas was on a commission basis, so he had every interest to lease as much space, including the NCO space, in this building. There was no restriction. In fact, the landlord could have said, well, lease all my space but NCO, but that's not the testimony. Mr. Haas testified his instructions were to lease all the space in the building with no restrictions. Lease the space. Make your commission, which is exactly what he attempted to do, tried to do, but frankly was unsuccessful in doing, as indicated by the fact that 17,000 of 500,000 square feet were leased. I also suggest that the case that was relied upon by the district court, the Circuit City case, really doesn't support the propositions both generally as used by the district court or specifically in this case. One of the interesting things about Circuit City, you will find that there was a rent claim and a damage claim. In the rent claim, what Circuit City decided, which is frankly indicated that this wasn't even an issue, if you read Circuit City, and I'll get you the citation to that provision, in Circuit City the court found that there was no rent claim available because the landlord had accepted the surrender of the premises. And at 829 Atlantic 2nd on page 989, what the Court of Appeals noted was there couldn't be a rent claim because the landlord had accepted the surrender and therefore the rent claim went away. What was left was a damage claim. And what was left as a damage claim went back to the Circuit Court, and the Circuit Court had to decide whether or not there would be mitigation. There are two things to note on this. First of all, the landlord in that case had demolished, destroyed the leased premises so that the exact leased premises couldn't be re-let. He destroyed it. That's not the case here. The second important distinction in this case is that the lease in this case specifically provides that the purpose of the provision requiring the landlord to utilize reasonable commercial efforts was to mitigate the damages. The lease, which was negotiated by sophisticated parties, as this court found in its first opinion, the lease doesn't say use reasonable commercial efforts or you get no damages. It's a forfeiture. The lease could have said that. It didn't say that. It basically simply said use reasonable commercial efforts to mitigate the damage. And yet the district court in this case did not apply that standard. It simply said, well, you get no damages. Well, that is not the law of the State of Maryland, never has been. The law of the State of Maryland clearly has been over the years, and there's no indication that the mitigation rules were intended to be changed in Circuit City. In fact, Circuit City said when you send the case back to the district court, the circuit court, the circuit court can look at such things as could Food Lion, what revenue did they get from Food Lion? You'll recall in Circuit City there was a food store in the premises. It was the tenant left. The landlord demolished the premises, made bigger premises, and Food Lion comes in to rent the premises. But when the court of appeals sends it back to the circuit court, it says you can consider mitigation of damages by the fact that Food Lion did come in and take some of the space. So Circuit City doesn't stand for the proposition that where there's no mitigation, you automatically lose. It simply stands for the proposition, as we've always suggested in this case, that if there was some factual finding that was in accordance with Maryland law, that there was no mitigation, that it goes back, and there's a decision on whether or not that breach resulted in mitigation of damages. Well, there has to be a demonstration that the damages could have been avoided by mitigation. It's not a condition. Correct. There's nothing in this lease. And so the idea is if it would take at least a month to lease, if that's the argument the other side would make, you're still entitled to damages for at least a month. If they could demonstrate that. But your argument is, I gather, that the court treated it as a condition precedent, which is not a mitigation doctrine. Mitigation doctrine focuses on those damages that could have been avoided. That's exactly correct, sir. The district court dealt with this as a condition precede, yet there is no language in this lease which suggests it's a condition precede. The language is very clear that the purpose of the covenant to exercise reasonable care is to mitigate damage, not as a condition. And the question is, did we fulfill the obligation? If not, it is the defendant NCO's burden to prove that we failed to mitigate damage. Judge Bell, when he was speaking for the Court of Appeals in the Schlossberg case, which is cited in the brief, laid this out very specifically. As you know, Judge Bell became Chief Judge of the Court of Appeals. And Judge Bell discusses the whole area of mitigation of damages, points out that it serves to reduce damages but not eliminate damages, and that it is the defendant, the breaching party's, burden to prove mitigation, prove what the mitigation was. And, in fact, there were a number of expert witnesses sitting in the courtroom throughout the trial, or at least portions of the trial, who were going to testify about that. But they never got that chance. Mr. Goldberg, before you sit down, would you briefly address, it seemed that district court was concerned with the difference in how you treated CoStar advertising, and it was concerning. It seemed like you were almost pushing it as it wasn't even an empty space. Can you address that? Yes, sir. It is absolutely correct that CoStar was not listed specifically, that the NCO space was not listed specifically in CoStar. But Montgomery Park was listed in CoStar. Montgomery Park showed on CoStar that there were 400,000 square feet available, and that, yes, the NCO space was not specifically indicated. But what happened to the other 400,000 square feet? There's absolutely no evidence. I know you addressed it and nothing moved, but what's the reasonable justification for not listing the NCO space? The justification was they didn't want to list too much space as being vacant because it stigmatizes the building. Even Mr. Gaines, when I asked him, can too much space being available in a building stigmatize it? There must be something wrong with it. Why would I move into a building which is half empty? That kind of issue. And, yes, that was a business decision that the owners and, frankly, the kind of potential lessees for the space of NCO, they really aren't concerned with traffic, are they? It's a call center. They don't care whether people are coming to the drugstore and buying. Other type stores are, but not there. A call center, you don't care. If your employees have parking space, that's all you need. Yes, and that's why perhaps in the terms of the differentiation that there was a need to put them in there and not just sort of, as the district court found, you're hiding them there so embedded in the overall but not pushed forward. It is correct that the district court basically was concerned about that issue, but I suggest to the court that a landlord doesn't have to do each and every possible thing that a landlord can do. A landlord has to act reasonably. It doesn't have to act and do everything that, after the fact, somebody can come in and say, well, you could have done this and you could have done that. That's not reasonable or the standard of reasonableness. The question is, under the case law that is both in Maryland and around the country, what does a reasonable landlord have to do? Wilson v. Rule says, all you need to do is hire a broker. Let the broker worry about it. And, in fact, it was the broker for three and a half years who was the one who was the COSTAR person who they would communicate with. And the broker didn't feel that it was necessary to show NCO space on COSTAR. There's not a shred of evidence of that. So the standard doesn't require everything. It requires reasonableness. And, as a matter of law, Wilson v. Rule said hiring the broker was reasonable. But we did much more than just hire a broker. We did various things, as we talked about. So, yes, there is evidence that we could have done some things on COSTAR we didn't do. There's also evidence that it wouldn't have mattered, that what typically happens, because COSTAR, nobody knows, when you look at COSTAR, whether it was updated yesterday, a year ago, or ten years ago. All they know is it shows an amount of space. So what Mr. Haas testified to is what a broker does when he sees that. If he needs 108,000 square feet, he calls up, or even if he needs 500,000 and 400,000 thrown or shown, he calls up the contact person and says, what do you have? Let me ask you this just before you go. Yes, sir. Of all the space you had that was available, what percentage of that did you leave off and then list it as vacant? All of your non-NCO space. Didn't you take 100% of your un-leased space on COSTAR and said it was available? What we did was we said there was 400,000 square feet of space. And that's the balance of the other way, right? NCO plus that equals total amount of un-leased space. So the answer is zero. I mean 100% of yours, zero NCO. In other words, I'm following your theory that is too much un-leased space is the diminishing return in terms of marketing. I understand that. I just want to make sure that you did put 100% of your un-leased space on there, notwithstanding that theory. Mathematically, that is correct. We did not show the NCO space as vacant. That is correct, and therefore it was zero. But, again, we gave tours of the NCO space. Whenever someone, when people came in, they were, as I indicated earlier, there were more than a dozen tours of the NCO space. So it wasn't as if we were ignoring the NCO space. You can find something that we did to some other space but not NCO. And they did. They found COSTAR, where we did not list the COSTAR space specifically. But we don't have to do everything. I understand. Thank you. I appreciate that. Thank you. Thank you.  Salibi. Thank you. That looks like that was designed specifically for oral argument. Well, Your Honor, I had Judge Perper in Baltimore County once remarked when I did this that I was immediately elevating my argument. Yeah. That's fair enough. That's a better comment. I hope, let me put it this way, at least I hope closer to the truth by the time I finish. So thank you for your patience. May it please the Court, Andrew Levy, Brown, Goldstein, and Levy, on behalf of the appellee NCO. I'd like to address Judge Harris' question about the standard that applied in this case. And then, Judge Niemeyer, I'm looking forward to a conversation with Your Honor with respect to the contract principles that apply in the case where you have an exchange of promises, as you did in this case, and the effect of a finding that the, in this case, the promise extended to the tenant was not satisfied. But I would like to begin, if the Court will permit me, with respect to Mr. Goldberg's twice misstating the language of the Wilson v. Rule case. And in particular, he twice said that according to Wilson v. Rule, all the landlord needs to do is hire a broker. And, in fact, that's not what Wilson v. Rule says, and it's significant in this case. The language, and I quote, surely, and this is a reference to the Maryland statute, surely Section 8-207 requires no more than that the landlord seek out a reputable real estate broker and list the property for rent with that broker. And that, Chief Judge Gregory, is what did not occur in this case. It is not correct that they didn't list the NCO space. The NCO space was shown on CoSTAR as being occupied by NCO for the entire damages period. So the space was shown on CoSTAR, but it was shown as occupied and unavailable for rent. And when the district judge asked Mr. Rice, the managing director of Montgomery Park, what were prospective tenants told about the status of the NCO space? Were they told it was occupied? His answer was, I am not 100% sure about that. That testimony alone, if it please the court, would have been supported in the district court's finding sitting as the trier of fact that reasonable commercial efforts were not used. And reasonableness under Maryland law is quintessentially an issue for the finder of fact. We cite the physician services case in our brief, which is based on an old Maryland case, Allview Acres 229, Maryland 238. What will constitute reasonable efforts under a contract expressly or impliedly calling for them is largely a question of fact. And the contract here is a lease. Can I ask you a question about the standard of review? Yes, ma'am. I'm interested in that. I mean, it does seem to me that the district court applied a legal rule that sort of general efforts to rent the space could not constitute reasonable commercial efforts, no matter how significant they were, that there needed to be efforts targeted specifically at this space. Is that your understanding of the legal standard? Not completely, Your Honor. I think the district court's finding in that respect was twofold. The district court expressed skepticism repeatedly on the record and then in its opinion that all of the things that the landlord said it had done were in fact done. There were a remarkable few documents that sort of. Just so I know where you're headed. So you're saying you don't believe that the district court applied that standard? I think the district court applied a reasonable, I think it is a contract. I think it's a question of fact for the finder of fact with respect to what the parties meant when they used the phrase reasonable commercial efforts in the lease. So your understanding is that the district court made a finding that these parties intended that language to mean efforts specifically targeted at the NCO space? Well, I think in part. I don't think the court. Let me just ask you my question and see if you can help me understand this case. I am concerned that the district court applied a legal standard that would have required the landlord to make efforts that were targeted specifically at the NCO space in order to meet this standard and that the district court's finding turned crucially on application of that legal standard. And I don't hear you defending that legal standard. So this is my concern. Can you address that? Well, I'm definitely defending that standard, which is the cases cited. So the difference is between a contractual provision in which the parties agree that commercial, reasonable commercial standards must be used versus the common law mitigation standard with respect to damages, which is not applicable in this case. So I think the court found that when a, twofold, I think the court found that when the parties agree using objectively clear language under the objective, you know, theory of contracts, when they agree that reasonable commercial efforts are to be used to mitigate damages with respect to particular space, that that is an agreement to use those efforts with respect to that space. And while efforts for the building in general are not necessarily irrelevant to satisfying that standard, if it does not necessarily satisfy that standard. And that here in response to the point that the chief judge made, 100 percent of the non-NCO vacant space was shown as available on COSTAR. 100 percent of the available NCO space was shown as occupied and unavailable on COSTAR. And while the testimony at trial was ambiguous at best with respect to whether that was intentional or inadvertent by Montgomery Park, and we have a long footnote in our brief in which that testimony kept changing, which in and of itself would justify the district court to be skeptical of the testimony. But if we take them at their word that what they were trying to do was not make the building look too vacant, they could easily have taken some of the non-NCO space and shown that as unavailable and shown the NCO space as available. Judge Niemeyer, I heard your question to Mr. Goldberg, your observation with respect to how the district court treated its finding that this contractual provision was breached. And it is very much our position that this is a case which needs to be analyzed using contract principles and the effect of a breach of a material provision. And there is a case which is not cited in the brief, and we didn't find until after we reviewed Mr. Goldberg's reply. But I would very much ask the court to review it. It's the K&G Construction v. Harris case, and the site is 223 Maryland 305. It's a 1960 case written by Judge Prescott for the Maryland Court of Appeals. It is the case relied upon by the very first case cited in the reporter's notes to Section 232 of the Restatement Second Contract. And the Williston Treatise refers to the K&G case as a leading case on the question of what the effect of a breach of a promise is on the obligation of the other party. I actually understand that. I think that's what the district court did, that when you have mutual breaches in a case, then one is a condition, a waiver of the other, a forfeiture or whatever it is. My problem is it looks to me in the contractual language here that the language does not make it a condition. To the contrary, it says there is an obligation on the landlord to mitigate damages, but that damages will continue no matter what. It doesn't make it a condition to further damages. And the parties seem to agree, as did the district court, that the common law doctrine of mitigation of damages was being incorporated here. And that doctrine, by the same standards you're looking at, these texts and the cases in Judge Bell's opinion, basically you focus on those damages that could have been avoided by reasonable efforts. In other words, it doesn't cause a forfeiture of all damages. It only causes a loss of damages that could have been avoided by reasonable efforts. That's the doctrine. And I disagree completely with that. I understand you do, but that was my question. Let me explain that. I'm looking at a paragraph, 1403F. Yeah. And 1403F says that the damages will not be diminished by the fact that they go on, and they say, but the landlord does agree to use reasonable efforts. And then it says, no action taken by the landlord under these provisions shall operate as a waiver of any right which a landlord would otherwise have a tenant for the rent hereby reserved and otherwise. And the tenant shall at all times remain responsible to the landlord for any loss or damage suffered and so forth. And so the point being is that the damages continue, except to the extent they are not mitigated, which is the common law doctrine of mitigation. Yes, Your Honor. That's my whole point. Okay. And my point is that under basic contract principles, if the promises, if the exchange of promises are dependent promises, and what K&G says is that that is the modern rule, is that the presumption is that such promises are dependent rather than independent. Except the contract. You never, Your Honor, you never get to damage, you don't get to the mitigation of damages doctrine because you don't get to damages if there's been a mutual failure. Except this provision does not say damages are conditioned on that. It's just the opposite. What it says is that you get damages, but the damages are subject to mitigation. And the mitigation, which is the doctrine, but we're both looking at the same contract language. We are, Your Honor. And I would say with respect that I do not believe that the language of the contract is as Your Honor characterized it. It uses. Well, I was reading it, actually. Well, yes, sir. But the critical promise extended by the landlord to the tenant begins but, which is a classic conditional conjunction. And it is typically a language used in a contract where you are intending to condition rights on or promises on other promises. But, see, it doesn't condition, it doesn't condition the fact that they're going to get damages. What it does condition, it conditions the amount of damages. It says reasonable efforts to mitigate damages. And then it goes on to say again, but damages still are ongoing. So the burden is that is exactly the common law doctrine. And the common law doctrine says you focus on those damages that could have been avoided. Otherwise you have a forfeiture. And the law abhors a forfeiture. It's not a forfeiture. Well, what about the damage? How long, it looks to me that you could argue pretty reasonably that it would at least take a few months if you had the best efforts of any kind. And this market is a terrible market and his location may have been a terrible location. But let's assume it took six. So they knew where the building was when they entered into this. I understand. I mean, the building's location didn't change. Look, let's get to my hypothetical. My assumption is that they could have released it within a few months. And, Your Honor. This is an assumption. Now, if it takes three months to lease it, that means damage is continued for at least three months because those damages could not have been avoided. And what the district court did is took those three months of damages. Let's say the best efforts, you could forecast the best efforts would give rise to. But you're not starting early enough, Judge. Let me finish, please. I'm sorry. The best efforts would lead to a lease within three months after the breach. And so you at least have three months of damages. The district court forfeited that. Those three months were precluded because the court said this is a mutual breach under the doctrine where you have somebody breaches a contract and the liability is then waived. Here we're focusing on just those damages that weren't mitigated. But I understand your argument. No, Your Honor. I'm not sure you do, which is, first of all, they knew if you want to focus on the timeline, they knew as early as February 2011 that NCO was going to be moving out. So the damages period didn't begin for another four months. So if Your Honor wants to say that they needed a little lead time, they had months in which to gear up. Listing on COSTAR is something that literally can be done in the same day. And we, as Hemel Ridge Associates, well knew. Again, Your Honor, Your Honor may quarrel with the common law as applied in Maryland. No, I don't quarrel with it at all, except that Judge Bell laid it right out. Well, I don't see forfeiture, I don't see forfeiture anywhere where there is a, where you have dependent promises and there's a presumption that these promises were independent. This contract uses the word waiver, not forfeiture. But the contract says there is no waiver. And it followed immediately with the word, but landlord does agree to use reasonable commercial efforts, which I think is conditional. No, it's just the opposite. It follows it, says no section taken by the landlord under the prision of this section shall operate as a waiver of any right which a landlord would otherwise have against the tenant. Well, that's right. So it's not a condition to damages. But the language before that, Your Honor, is in order shall tenants' obligations be diminished by reason of any failure by landlord to re-let the premises or any failure by landlord to collect any rent due upon such re-letting. But landlord does agree to use reasonable commercial effort to mitigate damage. That's the only promise made by the- Left off to reduce the damages. Not to, not, doesn't relieve them of the obligation. But it was stated in the form of a contractual promise. Sure. And comment B of section 232 of the Restatement Second of Contracts. You generalize the fact that it's a contractual provision, but the contractual provision only addresses damages. It doesn't address liability. It only addresses damages. And it says damages have to be mitigated. So you start with the assumption there are damages, and those that are not mitigated are avoided. But, Your Honor- You left out that clause that it says reasonable commercial to mitigate damages caused by the default. The comment B of section 232 of the Restatement Second says that when we're talking about an exchange of promises, which are presumed to be dependent upon each other, the court is to focus on the relative importance of the failure of performance in the light of the situation of the parties at the time of that failure. The landlord's failure here, its failure to honor its contractual promise began on the first day of the damages period and extended for the entire damages period. And the common law says that where you have such an abject failure to honor dependent promises, you don't get to damages. And that is K and G. That is the law as summarized by this Court's Westinghouse decision. And it is- Your Honor may be unhappy that that is the effect and may feel that it's unfair to the landlord in this case. Mr. Levy, I don't have any sense of unhappiness. Thank you, Your Honor. Yeah. There are no further questions from the panel. I will submit. Thank you. Well, Mr. Levy, may I just point real quick? I don't- I think it would be- I'm not sure I'm saying this to- would be convincing to you, but let me at least give you my perspective of the very rich dialogue you had with my dear friend and colleague, Judge Nehemiah. And since- because you- keywords you said promise. In this contract, the aspect of the mitigating of damage and what happens, that's really, to me, not part of the promise. The promise made in this contract is that the lessor would provide habitable commercial space for the use that was anticipated by both parties for the occupation thereof. And the other promise on your client was to pay for those services, and they're called rents, as specified. And your client breached that. That was the promise. That was one promise. Well, that was one promise. But that was the promise of the contract, sort of grabbing the contract. But then after that breach, the rest becomes then how do we deal with what are the resulting damages? And it does have some obligations on the part of the- in other words, the landlord just can't sit back on his haunches and do nothing. It has to be a commercial reason. But that's not really- for example, it's impossible for them to breach that right before you breach. Mutual type breaches and promises are different. There's no promise they had before you did- before you breached, correct? There's no way they could have breached that without your client stopped paying rent or breached that. It is our breach that triggered the default provisions of this lease. And, Your Honor, I mean, it just seems apropos of the court's observation that, you know, the cases talk about how leases are this common law. Leases are a hybrid between the law of property and the law of contracts. But they're also clear, and Maryland cases talk about this, that once you get into the default provisions whereby there's been a surrender of the premises and the landlord is entitled to damages from the tenant, then you're in pure- at that point, the lease, we're no longer under modern conception of these things. We're no longer in the law of property where there's been this conveyance of this leasehold. We are just in contract land. And in contract land, these are- the tenant is required to pay damages. These are no longer- this is no longer rent. These are damages. It has a contractual obligation to pay damages. And the landlord is required to use, not under the common law avoidance of harm concept, which is typically when we talk about mitigation, but on a contractual promise here, which distinguishes this case from many of these other cases. It's not avoidance of harm that you typically think of in mitigation, Your Honor. It is the dependent, the exchange of dependent promises in this default provision. And, again, that comment B I read from Section 232 says that we focus on the position of the parties at the time of the failure to comply with the promises. And if you do that here, Your Honor, you have a- really the only right the tenant had, which was it says, look, we will be liable for all of this rent over all of this time, but you agree you've got to use reasonable commercial efforts to fill this space so as to cap our liability, limit our liability, and they didn't do that. And if these promises are dependent as they're presumed to be, then we never get to the question of damages because there was a mutual failure of performance. All right. I think I'm going to end the position. Thank you so much. Thank you, Your Honor. All right. Mr. Goldberg, if you'll just wait a moment and allow Mr. Levy to return to his- to counsel's table. We'll begin to start. Thank you. May it please the Court, I'll be brief. Counsel indicated that for some reason, Wilson v. Rule was misquoted because of the phrase that the landlord need only seek out a reputable real estate broker and list the property for rent with that broker. Well, if you look at the joint appendix at 661 to 662, we quote from the listing agreement. The listing agreement says, the broker shall use diligent and commercially reasonable required services in connection with the marketing, leasing, and releasing of all or any portion of the property. So all or any portion of the property includes the NCO space and did include the NCO space, even as indicated in the opinion of the district court. The district court noted at joint appendix 1228 the following, and I think this is really critical to some of the court's questions on the basic issue. The court said, quote, Montgomery Park, and this is in the court's rulings, through Himmelrich, Himmelrich did it before they hired the broker, and Mr. Haas, who was the broker, engaged in, the words of the district court, significant effort, including the creation of brochures, hanging banners, engaging with prospective tenants, and conducting tours of the premises, including several tours of the NCO space. That's what the district court found as a fact, that we did all these things, including tours of the NCO space. So the assumption that we simply did nothing, that NCO was disregarded, is simply not in accordance with what the trial court even found. He found that we had done several tours of the NCO space, but the standard he applied ignored all those. The standard he applied, he goes on to say, frankly, I thought we won after that statement was made. But then the standard he used was, quote, but these efforts were designed only to market Montgomery Park space as a whole, with no serious effort to target or release NCO space, end quote. Well, he goes on to say that we were supposed to hire a broker, essentially just to do NCO. Again, there's one thing. No, no, no, that's not what the district court said. It said that when we look at what you did, it seemed like it was designed for your unoccupied space and not for NCO. That's different to say, well, you only get credit if you do something specifically with them. The district court looked at what you did. For example, Coastal, why wouldn't you list them as available, as unoccupied space? I mean, you said that, but how were they listed on Coastal? How was NCO space listed in terms of on Coastal? It was listed as NCO being the tenant. So it was not listed as being occupied? That's not true? No, it doesn't say occupied. Well, it certainly implies occupied. It says NCO. Don't skip over it. That's important. You said it certainly was listed to imply that it was occupied? Yeah, I'm not trying to. Does that sound like that's reasonable to rent space if it's listed to, I'm using your word, to imply that it was occupied? Well, the fact of the matter is. Would you answer that question? Is it commercially reasonable to list it such that it would be implied that it's occupied? Under these circumstances, the answer is yes. The landlord has the right to make a business judgment. The landlord had the right to make the business judgment that the tenant. You're right. You have a right to make business judgment, but there may be consequences for your independent judgment, and that is you might lose your rent. That's the whole thing, right? It's your business. You can do anything you want. So you're absolutely right. You made a decision that favored your other unoccupied place. You listed, in your own words, on Coastal in such a way that it would be implied that NCO space was occupied. That is your business judgment. But it has consequences, though, doesn't it? But that judgment included the judgment of a professional broker, and we're entitled to be. We don't need a professional. That's common sense. I mean, I'm not a real estate broker, but I know if you list in my house to make it look like it's not for sale, then I'm going to fire you. I don't care how many experts you bring to me. I mean, you know what I'm saying? We lose sense of common sense. You, in your own words, I think you said it so eloquently. You said it was a listed sense that it would imply that it was occupied. Yeah. Two quick points, Your Honor. First, there was no mutual breach in this case. There was a breach which entitled us to rent. There's no evidence in the case, nor was there any at the first trial, that Montgomery Park participated in that breach. So the breach had occurred. The question is what damages are we entitled to? We proved the amount of damages for rent. They're entitled to – it was their burden to show if the court finds there's a legitimate issue of fact on commercial reasonableness, that would have to be determined by the district court because the district court used the wrong standard. And so – but according to NCO, let's suppose they breached the lease on day one, and on day 15 the court finds we didn't use reasonable efforts for the rest of the period, even though we hired a broker. But we're entitled to 15 days of rent, aren't we? And even if we had released the premises to someone but had to give them free rent, the lease provides that that's a credit against any mitigation and things like that. So according to their theory, it's simply purely a forfeiture. And it's not a forfeiture because it is not a condition preceding to the recovery of rent under the lease, and it is specifically stated in the lease that the whole purpose of the provision is to mitigate damages, which essentially is a common law rule. Goldberg, if someone owned an apartment complex that had 200 apartments available, and it found out that 25 percent of its present tenants were leaving in three months, do you think it would be commercially reasonable to wait until they all left three months later before you start actively trying to get to fill those? Would it be? Yes. But what's interesting in this case is we did show the premises before they left, and in their brief they criticized the fact that we put in evidence of tours of the NCO space before they left, and they said, well, that was irrelevant. Now they stand up and say, well, we could have had tours of the NCO space before they left. Well, we did. But if you look closely at their brief, they criticized the evidence that we put in that there were, in fact, tours of the NCO space before they left. But is the district court, is the trial of the fact in terms of what was reasonable? I'm just saying in terms of Mr. Levy argued, I mean, you do have some heads up in terms of when does the mitigation start. Maybe it takes three months. But if you had six months before that, then that's a fact question whether or not you, in fact, had any kind of the window started then. But the court, the district court even acknowledged is the fact that we gave tours of the NCO space. And some of those tours did include pre-tours prior to them leaving the space, which they criticized as being irrelevant in their brief. Thank you. Thank you. We'll come down to Greek Council and then proceed to our next guest.
judges: Roger L. Gregory, Paul V. Niemeyer, Pamela A. Harris